C. Roland POWERS, Plaintiff, Appellee,

v.

**GRINNELL CORPORATION,**
Defendant, Appellant.

C. Roland POWERS,
Plaintiff, Appellant,

v.

**GRINNELL CORPORATION,**
Defendant, Appellee.

Nos. 89–1687, 89–1724.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1990.
Decided Sept. 24, 1990.

William P. Robinson III with whom Judith Colenback Savage, Jon M. Anderson, Joseph S. Larisa, Jr., and Edwards & Angell were on briefs for defendant, appellant.

James H. Reilly with whom Terrence G. Simpson and Kelly, Kelleher, Reilly & Simpson were on briefs for plaintiff, appellee.

Before BREYER, ALDRICH and CYR, Circuit Judges.

CYR, Circuit Judge.

Erstwhile employee C. Rowland Powers instituted the present civil action after being discharged from employment by Grinnell Corporation in alleged violation of the Age Discrimination in Employment Act (ADEA) and the Rhode Island Fair Employment Practices Act (RIFEPA). Ultimately, Powers recovered judgment for $52,351 on the common ADEA and RIFEPA back pay awards, $52,351 in liquidated damages on the ADEA claim, attorney fees, and costs, but no award of prejudgment interest.[1]

## I

## BACKGROUND

Powers's employment with Grinnell commenced in 1946. Except for a brief layoff period in 1949–50, Powers worked for Grinnell continuously until 1984, when his employment was terminated following the elimination of Powers's "contract administration" position pursuant to a company-wide consolidation. Some months later Powers was rehired by Grinnell to work at the Jacob Javits Convention Center project, which was expected to last about two or three years. Powers initially was contacted about this position by Albert Beck, Executive Vice President of Grinnell. In the course of their discussions, Powers expressed concern about his employment future with Grinnell once the Javits Center project was completed. Beck assured Powers that there would be other employment within the company, and that he would assist Powers in obtaining another position. Beck offered Powers the position of "Contract Project Coordinator" at the Javits Center project, and Powers accepted. Powers later acquired the title "Project Manager."

With the Javits Center project nearing completion during the spring of 1986, Powers contacted Beck to discuss other employment positions with Grinnell. Over the next few months, Beck directed Powers's attention to three positions, which Powers pursued to no avail; two went to younger candidates; one was not yet established. Powers pursued a fourth position on his own, again unsuccessfully. On September 25, 1986, shortly after his fifty-seventh birthday, Powers was informed by Beck that Grinnell had no alternative but to dismiss him. Powers was discharged the next day.

On March 3, 1987, Powers filed the following age discrimination charge (administrative charge) against Grinnell with the Rhode Island Commission for Human Rights (RICHR) and the Equal Employment Opportunity Commission (EEOC).

1. On September 25, 1986, I was informed that I would be terminated the following day from my job at the GRINNELL CORPORATION. I had

1. The original judgment included an award of prejudgment interest, attorney fees ($37,436.25), costs ($3,038.55), but no award of front pay. The jury awarded Powers $52,351 in back pay on the common portion of the award, and, finding that Grinnell acted wilfully, it awarded Powers an additional $52,351 in liquidated damages under the ADEA. Also known as "double damages," liquidated damages match the amount of the back pay award (salary plus fringe benefits). Victims of willful ADEA violations therefore are automatically entitled to liquidated damages equal to their back pay award. Grinnell moved to exclude the prejudgment interest award. The court ordered Powers to elect between liquidated damages on the ADEA award (without prejudgment interest) and judgment on the RIFEPA claims (with prejudgment interest).

worked for the company or its predecessor corporations since 1946.

2. My last position with the company was that of project manager for the Javitz [sic] Convention Center in New York. Upon accepting this post in June of 1984, I was assured by Albert Beck, executive vice president, that I would be offered other employment within the company when this project was completed. In May of 1986, I contacted Mr. Beck about other employment employment [sic] opportunities within the company, since the aforementioned project was due to end on August 1, 1986. Mr. Beck referred me to three (3) positions, none of which I received. I learned that two (2) of these jobs were given to candidates younger than I and the company postponed a hiring decision on the other. I also expressed interest in a fourth position, i.e., manager of export sales, but was advised that I did not possess the necessary international sales experience. Similarly, a younger applicant was chosen for this position. On September 25, 1986, Mr. Beck told me that the company had no other alternative but to dismiss me.

3. I believe I have been discriminated against because of my age in that:

a. I am 57 years old (date of birth 8–8–29);

b. I maintained a satisfactory employment record at the company for many years in varied managerial positions;

c. My attempts to secure continued employment within the company after my project was completed were entirely unsuccessful;

d. Younger candidates, with less experience and/or tenure than myself, were chosen for the positions I sought. In fact, two (2) successful applicants had no relevant job experience.

e. Because I did not obtain one of the aforementioned jobs, I was terminated;

f. These discriminatory actions will cause me to suffer a loss of income and other work-related benefits.

Unable to secure a settlement or reconciliation agreement, the RICHR issued a "right to sue" letter to Powers on September 22, 1987.

On September 24, 1987, Powers filed a four-count complaint with the United States District Court for the District of Rhode Island, alleging parallel claims under the ADEA and RIFEPA. Counts I and II charged Grinnell with age discrimination in discharging Powers from employment. Counts III and IV alleged age discrimination in Grinnell's refusals to hire Powers for the "numerous open positions" for which he applied. During late 1987 and 1988, the parties engaged in extensive discovery, which revealed that there were several employment openings at Grinnell during the relevant period, about which Beck had never advised Powers, and that, under an informal Grinnell policy, project managers were reassigned to other positions within the company after completion of their projects.

Since an early stage in the litigation, Grinnell has challenged the scope of the present action as overly broad in relation to the administrative charge. In July 1988, Grinnell sought partial summary judgment under counts I and II on the ground that the discriminatory *termination* claims exceeded the scope of the administrative charge. Powers opposed the motion, on the ground that the agency investigation reasonably could have been expected to probe whether age was a factor in Grinnell's termination decision. The district court denied the motion.

On the day before trial, Grinnell unsuccessfully attempted to prevent Powers from introducing evidence relating to any employment openings with Grinnell other than the four openings detailed in the administrative charge. During trial, the district court admitted evidence concerning: (1) nine job openings in addition to the four mentioned in the administrative charge; (2) the unwritten Grinnell policy relating to the reassignment of project managers upon completion of their projects; and (3) matters outside the June–September 1986 period covered in the administrative charge,

including job openings and the ages of the persons selected to fill the openings.

The jury returned verdicts for Powers on all counts, awarding $52,351 in back pay and $52,351 in liquidated damages. Judgment entered for $104,702 in back pay and liquidated damages, $37,436.25 in attorney fees, $3,038.55 in costs, and directing allowance of prejudgment interest as well. On Grinnell's motion to strike the prejudgment interest award, the district court directed Powers to elect either liquidated damages on the ADEA claims or prejudgment interest on the RIFEPA claims. Powers elected prejudgment interest on the ADEA claims, and the amended judgment was entered. These cross-appeals ensued.

## II

## DISCUSSION

### A. *Grinnell Appeal*

■■■ On appeal, Grinnell complains that it was unfairly surprised and preju-

diced by various district court rulings which effectively required that it defend against age discrimination claims outside the scope of the administrative charge.[2]

As a prerequisite to the commencement of a civil action under the ADEA, an aggrieved employee must file an administrative charge with the EEOC and with the parallel state agency designated by law in "deferral states."[3] 29 U.S.C. §§ 626(d), 633(b). The administrative charge "provides the [agencies] with information and 'an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation,'" *Kloos v. Carter–Day Co.,* 799 F.2d 397, 400 (8th Cir.1986) (quoting H.R. Conf.Rep. No. 950, 95th Cong., 2d Sess. 12, *reprinted in* 1978 U.S.Code Cong. & Admin.News 528, 534), and affords "formal notice to the employer and prospective defendant of the charges that have been made against it," *id.* See also *Caldwell v. National Ass'n. of Home Builders,* 771

---

**2.** Grinnell represents that it:

went to trial expecting, based on the clear language of the charge and the complaint, to defend a narrow case that it discriminated against Powers on the basis of age in the summer of 1986 by failing to hire him for the four positions detailed in the charge. Instead, the district court forced the company, in contravention of the statutorily mandated charge requirement, to defend a policy-based discrimination action. The magnitude of this error cannot be overstated. Grinnell began the trial explaining to the jury why Powers did not receive four jobs within the company. By the end of the trial, the company was put to the near impossible task of explaining why it could not find any job for Powers within its large empire.

Brief of Appellant Grinnell Corp. at 36. Grinnell's contention that it lacked fair notice of the breadth of these discrimination claims extends beyond the untenable, to the disingenuous.

The allegations of the complaint—that Powers was *discharged* in violation of the ADEA and RIFEPA—should have put Grinnell on notice that Powers intended to try more than a narrow "failure to hire" action. Moreover, in July 1988, six months before trial, Grinnell moved to dismiss the discriminatory *discharge* counts on the ground that they exceeded the scope of Powers's administrative charge. Powers successfully opposed the motion by pointing out that any agency investigation could reasonably have been expected to address whether plaintiff's age was a factor in Grinnell's decision to terminate, rather than reassign him. Surely Grinnell was on no-

tice then, at the latest, as to the breadth of the claims Powers intended to litigate. Furthermore, in Powers's answers to interrogatories Grinnell was again made aware of the breadth of Powers's contentions relating to positions other than the four identified in the administrative charge.

Nevertheless, whatever doubt could have remained about the matter was put to rest by the pretrial memorandum submitted by Powers in November 1988, some *three months before trial,* which explicitly set forth the claim that he had been discharged notwithstanding Grinnell's employee reassignment policy, and expressly stated that his discrimination claim encompassed other positions which Grinnell had not disclosed to him prior to his discharge. Among the "primary issues" for trial, identified in the pretrial brief, were the following: (1) whether Grinnell had a practice of finding new jobs for Project Managers when their work assignments were completed, and (2) whether other positions for which Powers was qualified were open at the time of his termination, or within a reasonable period thereafter. Thus, Grinnell's bald assertion that it was unfairly surprised because it was unaware of the breadth of the scope of the present action until the day of trial is flatly contradicted by the record.

**3.** A "deferral state" is one which (1) prohibits age discrimination in employment, and (2) empowers a state agency to grant or pursue relief from age discrimination. *See* 29 U.S.C. § 633(b). Rhode Island is a deferral state.

F.2d 1051, 1054 (7th Cir.1985); *Bihler v. Singer Co.*, 710 F.2d 96, 99 (3d Cir.1983); *Less v. Nestle Co.*, 705 F.Supp. 110, 112 (W.D.N.Y.1988).

"The scope of the civil complaint is accordingly limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." *Id.* at 112; *Johnson v. General Electric*, 840 F.2d 132, 139 (1st Cir.1988) ("complaint ... must reasonably be expected to have been within the scope of the EEOC's investigation"); *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 23–24 (2d Cir.) ("No action based on a claim of age discrimination may be brought in federal court unless the claim was properly raised with the EEOC ... and [is] within the scope of the EEOC investigation reasonably expected to grow out of that filing."), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). *See also Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970). Thus, ADEA claims are cognizable "if they are 'like or reasonably related to the allegations of the charge and grow[ ] out of such allegations.'" *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544 (7th Cir.1988) (quoting *Jenkins v. Blue Cross Mutual Hospital Ins., Inc.*, 538 F.2d 164, 167 (7th Cir.) (en banc), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976)), *cert. denied*, — U.S. —, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989); *Less*, 705 F.Supp. at 113. *See also Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir.1985) (en banc); *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir.1973).

Grinnell contends that the administrative charge made out a "particularized failure to hire claim," confined to the four positions there mentioned, and insists that the district court erroneously permitted the present action to encompass a "generalized failure to hire claim" based on other job openings, the informal company policy of reassigning project managers after the completion of their projects, and a temporal span reaching beyond the period identified in the administrative charge.

The Grinnell containment effort overlooks the plain import of the administrative charge as a whole and ignores the breadth of the administrative inquiry reasonably required to investigate the charge. For example, the administrative charge asserts that Beck assured Powers that he would be offered other employment within the company on the completion of the Javits Center project. Instead, Powers was informed that "the company had no alternative" but to dismiss him. This is not the case of a prospective employee whose administrative charge merely asserts that the employer refused to hire him for any of four specific positions for which he applied. Instead, the present action concerns the complaint of a longstanding employee of the defendant company, whose administrative charge expressly alleges that the employer assured him, before he ever accepted a particular employment position, that continued employment would be found for him within the company upon the completion of the temporary assignment he was being asked to consider, but who was abruptly dismissed after unsuccessful efforts to pursue four replacement positions in the company for which younger and less experienced persons were hired instead.

Grinnell's argument that the administrative charge "said not a word" about a reassignment policy, or about the nine other positions, misapprehends the "scope of the charge" rule. An administrative charge is not a blueprint for the litigation to follow. *See EEOC v. General Electric Co.*, 532 F.2d 359, 364 (4th Cir.1976) (quoting *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453, 455 (5th Cir.1975)) ("The charge is not to be treated as a common-law pleading that strictly cabins the investigation that results therefrom, or the reasonable cause determination that may be rested on that investigation. The charge merely provides the EEOC with 'a jurisdictional springboard to investigate whether the employer is engaged in any discriminatory practices.'"). *See also Graniteville Co. v. EEOC*, 438 F.2d 32, 38 (4th Cir.1971) (purpose of charge is to initiate EEOC investigation, "not to state sufficient facts to make out a prima facie case"); *Sanchez,*

431 F.2d at 465 ("[T]he purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC."). Thus, "the exact wording of the charge of discrimination need not 'presage with literary exactitude the judicial pleadings which may follow.'" *Tipler v. E.I. duPont deNemours & Co.*, 443 F.2d 125, 131 (6th Cir.1971) (quoting *Sanchez*, 431 F.2d at 466). Rather, the critical question is whether the claims set forth in the civil complaint come within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez*, 431 F.2d at 466; *Babrocky*, 773 F.2d at 863; *Miller*, 755 F.2d at 23–24; *Less*, 705 F.Supp. at 112.

We consider it clear that Grinnell's decision to discharge Powers, rather than employ him elsewhere within the company, was at the very heart of the administrative charge. Therefore, all evidence relevant to the charge, including Grinnell's unwritten reassignment policy and the nine other openings, reasonably could be expected to have come under administrative investigation.

Thus, the claim that Grinnell willfully discriminated against Powers by not reassigning him to fill an available opening pursuant to its unwritten policy came well within the scope of the administrative charge.[4]

### B. *Powers Appeal*

■ The district court required Powers to elect either a back pay award, with *liquidated damages*, under counts I and III (the ADEA claims) *or* back pay, with *prejudgment interest*, under counts II and IV (the RIFEPA claims).[5] Powers requests that we reconsider our holding "that an award of liquidated damages bars prejudgment interest in ADEA cases," *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir. 1982), in light of *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), on the ground that *Thurston* effectively overturns *Kolb*.[6]

---

**4.** The record does not indicate whether either agency conducted an investigation. Of course "it is not the scope of the actual investigation pursued that determines what complaint may be filed, but what EEOC investigation could reasonably be expected to grow from the original complaint." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 128 (7th Cir.1989). *See also Oblesby v. Coca–Cola Bottling Co.*, 620 F.Supp. 1336, 1344 (N.D.Ill.1985) ("What controls is not what the EEOC did but what it was given the opportunity to do.").

**5.** Powers concedes that his failure to present the issue for jury consideration precludes prejudgment interest on the back pay award under the ADEA. *See Robinson v. Watts Detective Agency*, 685 F.2d 729, 742 (1st Cir.1982), *cert. denied sub nom Consolidated Service Corp. v. Robinson*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983); *Furtado v. Bishop*, 604 F.2d 80, 98 (1st Cir.1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). Grinnell concedes that Powers may recover either prejudgment interest on the RIFEPA back pay award or liquidated damages under the ADEA.

**6.** *Kolb* accords with the pre-*Thurston* view in most circuits. *See, e.g., Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981); *Blim v. Western Electric Co.*, 731 F.2d 1473, 1479–80 (10th Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101–03 (8th Cir.1982); *Rose v. National Cash Register*

*Corp.*, 703 F.2d 225, 230 (6th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1552 (11th Cir.1984), *overruled by Lindsey v. American Cast Iron Co.*, 810 F.2d 1094, 1102–03 (11th Cir.1987); *see also Kossman v. Calumet County*, 800 F.2d 697, 702–03 (7th Cir.1986) (post-*Thurston* decision), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 151 (1987). *But see Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 556–57 (9th Cir.1983) (successful ADEA claimant may recover prejudgment interest on back pay award and liquidated damages).

> The [majority] rule was based on the view that Congress intended for liquidated damages under the ADEA to be compensatory in nature and to cover, among other things, loss due to delay—precisely what prejudgment interest protects against. To permit recovery of both prejudgment interest and liquidated damages would result, therefore, in a successful plaintiff recovering twice for the same loss.

*Linn v. Andover Newton Theological School Inc.*, 874 F.2d 1, 6 (1st Cir.1989).

Section 7(b) of the ADEA, 29 U.S.C. § 626(b), requires that damages under ADEA be computed as in cases under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* Courts have relied on the ADEA's incorporation of FLSA remedies, *see Brooklyn Bank v. O'Neil*, 324 U.S. 697, 715–16, 65 S.Ct. 895, 906, 89 L.Ed. 1296 (1945) (FLSA plaintiff cannot recover both pre-

*Thurston* held that an ADEA "violation is 'willful' if the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Id.* at 128, 105 S.Ct. at 625.[7] In the course of its discussion, the Court observed that "[t]he legislative history of the ADEA indicates that Congress intended for liquidated damages to be punitive in nature." *Id.* at 125–26, 105 S.Ct. at 623–24.[8] Powers argues that the quoted statement undermines the rationale in *Kolb*. An award of prejudgment interest would not constitute double recovery in these circumstances, insists Powers, since liquidated damages under the ADEA are meant to punish and deter, not to compensate for loss due to delay.[9]

In the aftermath of *Thurston*, two courts of appeals have approved simultaneous recoveries of prejudgment interest and liquidated damages under the ADEA. *See Reichman v. Bonsignore, Brignati & Mazzota, P.C.*, 818 F.2d 278, 281–82 (2d Cir.1987); *Lindsey v. American Cast Iron Pipe Co.*, 810 F.2d 1094, 1102 (11th Cir. 1987) (divided panel). These decisions rely heavily on the *Thurston* characterization

that liquidated damages awarded under the ADEA are "punitive in nature."

In *Linn v. Andover Newton Theological School, Inc., supra,*[10] we discussed, but did not decide, whether there was life left in *Kolb* after *Thurston.*

[I]t is far from clear to us that our decision in *Kolb* must be abandoned. *Thurston* dealt only tangentially with the precise issue before us here. Moreover, the relevant portion of that opinion was quite brief. Indeed, the second and eleventh circuit decisions turned on a single statement by the Court: "... liquidated damages are punitive in nature." 469 U.S. at 125, 105 S.Ct. at 624. Had the Court intended for so much to turn on its characterization of liquidated damages, it seems reasonable to assume it would have mentioned contrary legislative history, and in particular would have reconciled its position with the House Conference Report to the 1978 amendments, relied upon so heavily by circuit courts in concluding that liquidated damages are compensatory. The House Report, which post-dated the legislative history cited by the Court, states flatly that

---

judgment interest and liquidated damages because liquidated damages serve as "compensation for delay in payment of sums due under the Act"), and ADEA legislative history indicating that ADEA liquidated damages are to compensate for delay, and are not punitive in nature. *See, e.g., Gibson,* 695 F.2d at 1101–02 (quoting H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess. 13–14, *reprinted in* 1978 U.S.Code Cong. & Admin.News 528, 535); *Blim,* 731 F.2d at 1479–80.

**7.** *Thurston* rejected the contention that an ADEA violation is willful "if the employer simply knew of the potential applicability of the ADEA," *Thurston,* 469 U.S. at 127, 105 S.Ct. at 625, *i.e.,* "that the ADEA was 'in the picture,'" *id.*

**8.** *Thurston* adverted in particular to the floor statement of Senator Javits that liquidated damages would "furnish an effective deterrent to willful violations [of the ADEA]." *See Thurston,* 469 U.S. at 125, 105 S.Ct. at 625 (quoting 113 Cong.Rec. 7076 (1967)).

**9.** Powers further argues that an award of prejudgment interest does not entail double recovery even if ADEA liquidated damages are purely compensatory, since the awarding of prejudgment interest under R.I.Gen.Law § 9–21–10 is a ministerial act designed to encourage settlement. *See DiMeo v. Philbin,* 502 A.2d 825, 826

(R.I.1986). Powers misapprehends Rhode Island case law, which holds that prejudgment interest "promotes early settlements, and more importantly, it compensates persons for the loss of use of money that was rightfully theirs." *Murphy v. United Steelworkers of America Local 5705,* 507 A.2d 1342, 1346 (R.I.1986); *see also Martin v. Lumberman's Mutual Casualty Co.,* 559 A.2d 1028 (R.I.1989) (prejudgment interest serves to encourage settlement and to compensate for delay in payment); *Turnpike & Bridge Authority v. Bethlehem Steel Corp.,* 446 A.2d 752, 757 (R.I.), *appeal dismissed,* 459 U.S. 938, 103 S.Ct. 247, 74 L.Ed.2d 194 (1982).

**10.** Linn asserted ADEA and pendent state law claims. Judgment was entered for $166,511.03 in back pay, an equal amount in liquidated damages, and $73,813 in prejudgment interest on the state law back pay award. We held that, "in *this* case, prejudgment interest should not have been awarded." (emphasis in original). *Linn,* 874 F.2d at 6. We did *not* definitively resolve whether *Kolb* remained good law, since *Linn* had taken the position, "on appeal and below, that he [could] not recover both awards under the ADEA," *id.* at 7. Then, accepting *Kolb* as the law of the case, we directed that the prejudgment interest award be stricken.

"the ADEA as amended by this act does not provide remedies of a punitive nature." *Gibson,* 695 F.2d at 1102. It also is worth noting that despite the almost total agreement among the circuits that liquidated damages were not meant to be punitive, the *Thurston* Court does not mention a single lower court decision. In short, we will not lightly presume that the Court intended to overrule, *sub silentio,* a view held by virtually every circuit to have considered the issue.

*Linn,* 874 F.2d at 7 n. 9. *Thurston* notwithstanding, we now reaffirm the holding in *Kolb,* essentially on the rationale ably articulated by Judge Coffin in *Linn.*

We are not alone in concluding that *Thurston* does not ordain abandonment of the majority rule that an award of liquidated damages under the ADEA precludes a recovery of prejudgment interest on the back pay award. *See Hamilton v. 1st Source Bank,* 895 F.2d 159, 165–66 (4th Cir.1990); *Burns v. Texas Refining, Inc.,* 890 F.2d 747, 752–53 (5th Cir.1989); *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1335–37 (7th Cir.1987), *vacated on other grounds,* 486 U.S. 1020, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1986). The principal rationale in these decisions accords with the analysis in *Linn: Thurston* speaks but obliquely to the issue at hand.

Thus, the Fourth Circuit explains, "*Thurston* did not address the issue of prejudgment interest, and its holding regarding liquidated damages as punitive was in the context of defining the standard for 'willfulness.'" *Hamilton,* 895 F.2d at 166. Along these same lines, since it is the "settled [rule] that under the FLSA prejudgment interest is not allowed where liquidated damages have been awarded," *Coston,* 831 F.2d at 1336 (citing cases), the Seventh Circuit continues to follow the same approach under the ADEA:

[C]ourts determining damages in ADEA cases should not whittle into the damages analysis required by the FLSA simply because the result might be different

if one looked at the ADEA as a separate animal from the FLSA and ignored the congressional command to look to the FLSA for damages. The decision to provide damages to ADEA plaintiffs as if they were FLSA damages is a decision made by Congress that precludes the courts from "legislating" their own favored remedies. We remain convinced ... that in ADEA cases prejudgment interest may not be awarded where liquidated damages are also awarded.

*Id.* at 1336–37; *accord Burns,* 890 F.2d at 752–53 ("It would be a difficult task to improve on the reasoning set forth in *Coston.*")

We believe that the revisionist view reads far too much into the one sentence in *Thurston* upon which it relies. With its focus only on whether "willfulness" is essential to an award of liquidated damages, *Thurston* simply observes that liquidated damages serve a punitive function. *Thurston* did not concern, and does not intimate, whether liquidated damages under the ADEA simultaneously serve the compensatory function of indemnifying employees for prejudgment delays in recouping their back pay.[11]

Moreover, our view is bolstered, as noted in *Linn,* by *Thurston*'s omission of any mention of the countervailing legislative history, *see* H.R. Conf.Rep. No. 950, 95th Cong., 2d Sess. 13–14, *reprinted in* 1978 U.S.Code Cong. & Admin.News 528, 535, or of the considerable store of circuit authority directly holding that ADEA liquidated damages serve to compensate for delays in receiving back pay. Finally, since an award of liquidated damages "usually will be far greater than would be necessary to compensate for delay—far greater, that is, than an award of prejudgment interest," *Heiar v. Crawford County, Wisconsin,* 746 F.2d 1190, 1202 (7th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985), it seems extremely unlikely that the rule in *Kolb* would in any manner undermine whatever deterrent or

---

11. Thus, the proposition for which *Thurston* was cited in *Reichman*—that liquidated damages serve only to punish and deter, and *not* to

compensate for losses, *see Reichman,* 818 F.2d at 282—is simply inaccurate. *Compare* cases cited *infra* p. 42.

punitive function was meant to be served by liquidated damages under the ADEA.

The existence of a punitive or deterrent aspect to liquidated damages under the ADEA is not inconsistent with our position in *Kolb*. We have never held that the *only* function served by liquidated damages is to compensate for loss due to delay in payment. *See Linn*, 874 F.2d at 6 ("The [*Kolb*] rule was based on the view that Congress intended for liquidated damages under the ADEA to be compensatory in nature and to cover, *among other things*, loss due to delay") (emphasis added); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1023 n. 35 (1st Cir.1979) ("liquidated damages ... are intended to cover damages that are difficult to ascertain") (where value of reinstatement highly speculative, availability of liquidated damages may be proper consideration in denial of front pay). Nor have we ever excluded the possibility that liquidated damages may also serve a deterrent or punitive function. *See, e.g., Kolb*, 694 F.2d at 872 n. 2 ("liquidated damages 'provide full compensatory relief for losses that are too obscure and difficult of proof to calculate other than by liquidated damages.'") (quoting H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess. 14, *reprinted in* 1978 U.S.Code Cong. & Admin.News 528, 535). Indeed, several circuits recognize that liquidated damages under the ADEA serve multiple purposes. *See Blum v. Witco Chemical Corp.*, 829 F.2d 367, 382 (3rd Cir.1987) ("[O]ne purpose of a liquidated damage award is to *compensate* the plaintiff for the delay in receiving back pay and benefits. However, liquidated damages are also *punitive in nature*, intended *to deter* future violations.") (emphasis added). *Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195, 200 (4th Cir.1990) (noting that ADEA liquidated damages serve "compensatory" and "deterrent" purposes); *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1205 (7th Cir.1989) ("[W]hile liquidated damages serve a *deterrent or punitive function*, Congress also intended liquidated damages to serve as *compensation*

for a discharged employee's nonpecuniary losses arising from the employer's willful misconduct.") (emphasis added); *Coston*, 831 F.2d at 1336 (although awarded on a *punitive* standard, liquidated damages serve *compensatory* purpose). *But see Blim v. Western Electric Co.*, 731 F.2d 1473, 1479 (10th Cir.) (" 'The ADEA ... does not provide remedies of a punitive nature.' ") (quoting H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess. 14, *reprinted in* 1978 U.S.Code Cong. & Admin.News 528, 535), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984).

As *Kolb* remains good law, *Linn* is dispositive. *See Linn*, 874 F.2d at 8 (*Kolb* rationale prohibits plaintiff from recovering both prejudgment interest on back pay award under state law claim and liquidated damages on ADEA claim). "The fact that prejudgment interest [was] awarded under state law does not alter [the] analysis." *Id.* "[A] plaintiff is entitled to only one full recovery, no matter how many legal grounds may support the verdict." *Id.* (quoting *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1345 (1st Cir.1988)).

Thus, the district court correctly required Powers to elect between liquidated damages on the ADEA claims and prejudgment interest on the RIFEPA claims.

## C. *Front Pay*

The court may grant "such legal or equitable relief as may be appropriate to effectuate the purposes of [the ADEA], including without limitation judgments compelling ... reinstatement." 29 U.S.C. § 626(b). Where "reinstatement is impracticable or impossible ... the district court ... has discretion to award front pay." *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir.1985). *See also Blum*, 829 F.2d at 383 ("front pay ... is the monetary equivalent of the equitable remedy of reinstatement").[12] Front pay serves to "mak[e] victims of discrimination whole in cases where the factfinder can reasonably

---

12. Powers does not request reinstatement.

predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir. 1984). Since future damages are often speculative, however, we have held that "the district court, in exercising its discretion, should consider the circumstances of the case, including the availability of liquidated damages." *Wildman*, 771 F.2d at 616.

After hearing, the district court refused to award front pay, on the grounds that it would be too speculative and that Powers had obtained a comparable position with another company and an award of liquidated damages. Powers challenges the district court's reliance on the liquidated damages award as a basis for its refusal to award front pay. Powers argues that a liquidated damages award should no longer be considered in determining the appropriateness of a front pay award. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988) (consistent with *Lindsey, supra,* a district court may not consider the availability of liquidated damages in determining whether to award front pay). Since we adhere to our rationale that liquidated damages under the ADEA serve a compensatory function, aside from any punitive function, the district court properly considered the liquidated damages award in its "front pay" analysis. *See Wildman,* 771 F.2d at 616 (consideration of liquidated damages proper in "front pay" analysis).

*The district court judgment is affirmed.*